**Clifford L. BELGARDE, Plaintiff,**

v.

**H. C. SMITH CONSTRUCTION COMPANY, Defendant.**

Civ. No. A78–2062.

United States District Court,
D. North Dakota,
Northeastern Division.

Feb. 14, 1980.

Paul E. Grinnell, of Cahill, Gunhus, Streed, Grinnell, Jeffries & Klinger, Moorhead, Minn., for plaintiff.

Michael D. Nelson and Lee Hagen, of Ohnstad, Twichell, Breitling, Arntson & Hagen, West Fargo, N. D., for defendant.

## MEMORANDUM AND ORDER

RONALD N. DAVIES, Senior District Judge.

In this civil rights action commenced pursuant to 42 U.S.C.A. § 1981, and the Civil Rights Act of 1964 (Title VII), 42 U.S.C.A. § 2000e et seq., the plaintiff, Clifford L. Belgarde, an enrolled Indian of the Turtle Mountain Tribe of North Dakota, alleged that he was unlawfully discharged by his former employer on account of his race. The defendant, H. C. Smith Construction Company, denied any discriminatory reasons for the discharge, asserting that the termination was justified because of plaintiff's unsafe work practices.

In 1974, the defendant, as subcontractor, was performing modification work on two Minuteman Missile installations, Wings[1] III and VI, which were, respectively, headquartered in Minot and Petersburg, North Dakota. Belgarde, a union certified journeyman iron worker, was employed by the defendant from November, 1974, until discharged on February 27, 1976. His first work as-

---

1. Each Wing contained numerous missile silos located at various sites.

signment was to a "basic iron crew" [2] as a "topside rigger" [3] on a Wing III missile site. At subsequent Wing III sites modified during 1974 and 1975, he worked either in the silos or as topside rigger and was, for a period of two to three months, designated as a site foreman in charge of the basic iron crew.

In December of 1975, Belgarde was transferred to Wing VI and again assigned to a basic iron crew. On February 27, 1976, he was working on a missile site as a topside rigger. The site foreman assigned a Caucasian iron worker, Lyle Rumbolz, to assist him in rigging three 12-foot long sections of steel, weighing approximately 1000 pounds for lowering into the silo. Two nylon chokers [4] were used in rigging the load and, though Belgarde suggested to Rumbolz that a "double wrap" [5] be used, only a "single choke" [6] was made on each choker. The load was raised by the crane operator and swung over a temporary steel building enclosing the missile silo where it was to be lowered through the roof and into the silo. Since the crane operator could not see the load once it was over the building, a phone had been installed inside by which a rigger could communicate with the crane operator and direct the lowering of the load. As Rumbolz was entering the building, but before he could reach the phone, the load struck the side of the roof opening, slipped out of the chokers and fell, narrowly missing three of the basic iron crew working in the silo.

The site foreman immediately confronted Belgarde and Rumbolz and asked who had rigged the load. Neither affirmatively admitted or denied doing so although Bel-

garde stated that he had suggested using a double wrap. The site foreman had the site superintendent radio the iron workers' general foreman and the iron workers' union steward to come to the site. Upon their arrival a meeting was held attended by the general foreman, union steward, site superintendent, site foreman, Belgarde and Rumbolz. When Belgarde and Rumbolz were asked if the chokers had been double wrapped, they stated only single chokes were used. When asked who had done the actual rigging, neither replied. At this point the site foreman informed the general foreman that neither the plaintiff nor Rumbolz were wanted on his crew and that several of the crew stated they would not work with them. The general foreman told Belgarde and Rumbolz to report to the Petersburg headquarters and pick up their checks.[7] The general foreman went immediately to the defendant's Petersburg office where he informed the personnel supervisor of what had occurred and requested that Belgarde and Rumbolz be terminated. The personnel supervisor prepared termination slips which indicated that the discharges were for unsafe work practices and these, together with final payroll checks, were given to Belgarde and Rumbolz when they arrived.

The next morning, Belgarde, accompanied by David Kanenwisher, a fellow iron worker on the same crew, went to Rumbolz' residence and inquired if he would go to the union steward and sign a statement accepting full responsibility for rigging the load. Rumbolz agreed to do so, feeling that if they had used a double wrap as Belgarde had suggested, the accident would not have

---

2.  A basic iron crew, assigned to each missile site, was comprised of electricians, millwrights, iron workers and laborers, with one of the iron workers designated as site foreman by an iron worker general foreman in overall charge of 20 25 sites.

3.  A topside rigger was an iron worker assigned by the site foreman to work outside the missile silo preparing (rigging) material for lowering into the silo by crane.

4.  A choker is a length of nylon strap with loops at both ends that is placed around material

with one loop being attached to a crane hook enabling the crane operator to raise and lower the material.

5.  The term double wrap means that the choker is lapped around the material twice prior to being drawn taut.

6.  The term single choke means that the choker is lapped around the material once prior to being drawn taut.

7.  Meaning they were fired.

occurred. The union steward was contacted and requested to prepare the statement. The steward inquired whether Rumbolz was sure he wanted to sign such a statement and he replied that he might as well as he was leaving the state. The statement was prepared, signed by Rumbolz and witnessed by the steward, in which Rumbolz accepted responsibility for the accident and that "the rigging that was done on the material that fell was performed by myself alone."

That afternoon Belgarde and Kanenwisher met with defendant's labor relations manager, the iron workers' general foreman, the union business agent and the union steward in an attempt to have Belgarde rehired. Belgarde presented Rumbolz' statement and, for the first time, denied participating in rigging the load. The union steward, who had that morning prepared Rumbolz' statement and had participated in the events of the previous day, stated that he still believed that both Rumbolz and Belgarde were responsible for rigging the load. Both union representatives concurred in the labor relations manager's decision not to rehire Belgarde.

A verified charge was filed with the Equal Employment Opportunity Commission (EEOC) in which Belgarde asserted that he was unjustly discharged because of his race. The EEOC investigated and concluded that there was reasonable grounds to believe that defendant had violated Title VII on the grounds that no personnel action had been taken against Caucasian employees who committed similar or worse unsafe work practices. Efforts to conciliate the dispute were unsuccessful and a right-to-sue letter was issued. This action followed, Belgarde alleging that as he had not participated in any unsafe work practices the defendant was without justification in terminating his services and, because defendant had not taken personnel action against Caucasian employees who committed similar or worse unsafe work practices, Belgarde's termination was for no other reason than his being a member of the Indian race.

In private Title VII actions challenging employment discrimination, a specific order and allocation of proof was established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If the plaintiff establishes a prima facie case the burden shifts to the employer to show some legitimate, nondiscriminatory reason for the discharge. If this is done the plaintiff must then be afforded an opportunity to show that the employer's stated reason was, in fact, pretext.

As the full merits of Belgarde's allegations and defendant's defense have been considered and appraised in reaching the conclusion that Belgarde did not suffer employment discrimination based on his race, it is unnecessary to make a specific determination that Belgarde established a prima facie case, *Mosby v. Webster College*, 563 F.2d 901 (8th Cir. 1977).

The evidence clearly established that Belgarde participated in an unsafe work practice, a legitimate, nondiscriminatory reason for his discharge. All of the iron worker witnesses, including Belgarde, testified that using a single choke on the load that fell was an unsafe work practice justifying discharge.

In an attempt to establish that the reason given by the defendant for the discharge was a pretext, evidence was presented that Belgarde, while working on a Wing III site in October, 1975, had a dispute with one of defendant's field superintendents over work schedules and, as a consequence, the superintendent allegedly told the general foreman that he should "fire that Indian" and the site superintendent "fire that damn Indian." Both declined to do so, stating there was insufficient reason to justify such action. That a field superintendent, with the power to hire or fire, should tell a site superintendent, with little or no power to terminate anyone, to "fire that damn Indian" is not credible. In any event, given the context of the alleged conversations, reference to Belgarde as an Indian was descriptive, rather than racial, in nature.

A second incident referring to Belgarde's racial heritage allegedly occurred subsequent to his termination. William Kutz, a site superintendent on Wing VI and an iron

worker friend of Belgarde's, testified that he attempted to get Belgarde rehired. After contacting the union steward and the general foreman without success, Kutz went to the general superintendent and was told "You're not going to have to worry about that blanket ass. He's not going to be working for this company." Kutz also testified that he later talked to the field superintendent from Wing III who had told him to "fire that damn Indian" and that the field superintendent stated "I had my say in that", referring to Belgarde's discharge.

Kutz' testimony is, to say the least, highly improbable when compared to that of the union business agent who testified that within ten days to two weeks after plaintiff's discharge the defendant had agreed to rehire him and the only reason it did not do so was because the union was unable to contact the plaintiff, then living in a home without telephone service in Dunseith, North Dakota.

Belgarde's remaining contention, that personnel action was not taken against Caucasian employees who committed similar or worse unsafe work practices, ignores the fact that a Caucasian was discharged at the same time and for the same reason.

Much is made of the fact that defendant's safety incident reports reveal that, other than Belgarde and Rumbolz, no other employees were discharged for unsafe work practices. However, in other instances of safety violations, it was the violators themselves who were injured or endangered and corrective measures were taken to prevent future occurrences. In the most serious violation, the injured violator was hospitalized and later unable to return to work due to the permanent nature of his injuries and thus his discharge was not required.

Accordingly, the Court finds that Belgarde was not discharged or discriminated against because of his Indian race; that his discharge was based on legitimate, nondiscriminatory reasons and these reasons were not shown to be a pretext for prohibited discrimination. There was no conduct by the defendant violative of Title VII of the Civil Rights Act of 1964.

Judgment will be entered in favor of the defendant, with costs.

Defendant's counsel will prepare an order in compliance herewith and transmit through the Clerk of this Court.